**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KAMIAN SCHWARTZMAN, in his capacity as** | : | |
| **Receiver for the Receivership Estate established** | : | **CIVIL ACTION** |
| **by the Order entered in S.E.C. v. Robert** | : | |
| **Stinson, Jr., et al.,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **TALKING WATER, LLC, et al.,** | : | **No. 11-3934** |
| **Defendants.** | : | |

<u>**MEMORANDUM**</u>

**Schiller, J.**                                                                                    **August 9, 2011**

The Receiver brings this lawsuit to recover funds consumed by a Colorado real estate project known as Talking Water.  He alleges Defendant Jürgen Denk operated Talking Water as a racketeering enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO").  The Receiver also brings claims against Defendants including Lisa Denk and companies controlled by the Denks alleging RICO conspiracy, unjust enrichment, and fraudulent transfer.  The Court granted the Receiver's motion for an ex parte temporary restraining order on July 27, 2011, and conducted a preliminary injunction hearing on August 8, 2011.  Having granted the Receiver's motion orally at the hearing, the Court now sets forth its reasoning pursuant to Federal Rule of Civil Procedure 65(d)(1).

**I.     BACKGROUND**

The Receiver filed this action on June 16, 2011, alleging that Jürgen Denk, his wife Lisa, and entities associated with the Denks, including Pulse Asset Management, LLC ("Pulse"), LKJ Services, LLC ("LKJ"), and Talking Water, LLC (collectively, the "Denk Defendants")

wrongfully obtained and laundered funds that had ostensibly been invested in the Talking Water real estate development project.  (*See* Receiver's Mot. for TRO 3.)  The funds at issue in this case originated from entities associated with Robert Stinson.  The Court addressed the mechanics of the Stinson Ponzi scheme in granting summary judgment for the Securities and Exchange Commission in a related case, *SEC v. Stinson*, Civ. A. No. 10-3130, 2011 WL 2462038, at *3-5 (E.D. Pa. June 20, 2011).  In brief, Stinson and the "Life's Good Funds" Stinson controlled obtained over $17 million from over 262 investors.  *Id*. at *1.  Following an SEC investigation and civil enforcement action, the Court appointed Kamian Schwartzman as Receiver to recover investor funds lost in the Stinson scheme.  *See id*. at *2.

The Receiver has identified $1,065,000 in investor funds originating from the Stinson Ponzi scheme which made their way through the Talking Water project between February 10, 2009 and June 14, 2010.  (Receiver's Mot. for TRO 4; *see also id*. Ex. D, Wire transfer records; Compl. Ex. E, Wire transfer summary.)  The Denk Defendants launched the Talking Water development in Montrose, Colorado in 2006.  (Receiver's Mot. for TRO 5, 7-8.)  Jürgen Denk formed Talking Water, LLC as a Colorado corporation that winter, serving as the company's General Manager.  (Compl. Ex. F, Talking Water operating agreement § 5.2.)  Talking Water, LLC is a single-purpose entity formed to develop the 37-acre Talking Water tract in Montrose. (*Id*. § 2.1.)  Construction was to begin in the fall of 2007.  (Compl. Ex. H-2, May 10, 2007 Talking Water information packet.)

Talking Water, LLC made thousands of dollars in monthly payments to Pulse, LKJ, and directly to the Denks.  (Compl. Ex. T, Summ. of Talking Water payments to Denk Defs. [Talking Water payment summary]; *see also id*. Ex. R., Checks dated Nov. 2009 from Talking Water,

LLC payable to "Denk" and "Pulse/Denk," respectively.)  The Denks, Pulse and LJK received over $907,000 from Talking Water, LLC.  (Talking Water payment summary.)  Meanwhile, by 2008, the company was $2.3 million in debt due to two mortgage liens on the Talking Water tract.  (*See* Receiver's Mot. for TRO 6.)  The debt load was apparently unsustainable; Jürgen Denk ultimately wrote to one of his lenders in July of 2008 to request an adjustment in the payments due on one of the mortgages.  (*Id*. Ex. F, July 7, 2008 letter from Jürgen Denk to Klenholz Miller & Company.)  Talking Water also failed to pay approximately $8,000 in property taxes due for the 2007 tax year, triggering the tax sale of the Talking Water real estate. (*Id*. Ex. A, May 26, 2011 letter from James Brown re: tax sale of Talking Water, Ex. B, Talking Water tax summary.)  Nevertheless, Talking Water, LLC continued monthly payments to Pulse in excess of $11,000 each month in 2007.  (*See* Receiver's Mot. for TRO 4; *id*. Ex. C, 2007 checks payable to Pulse.)

Michael McNamara served as a "point of contact" for investors interested in the Talking Water development.  (Compl. Ex. D-4, 2008 Talking Water informational packet.)  McNamara contacted Stinson regarding his funds' investments in the project.  (*See* Compl. Ex. M, Mar. 30, 2010 e-mail from Michael McNamara to Robert Stinson.)  McNamara and Jürgen Denk represented to Stinson that, among other things: (1) Life's Good, Inc. would be a secured lender in first position on a $700,000 construction loan; (2) the Talking Water project was on schedule to begin construction in 2010; (3) the Life's Good High Yield Fund would receive 19% interest on a $200,000 loan that would mature in one year; and (4) that Talking Water would limit management fees it paid to 2% of "hard costs."  (Receiver's Mot. for TRO 5.)  Stinson's funds subsequently invested in Talking Water.  (Wire transfer records.)

Following the SEC's investigation into Stinson's operations, the SEC discovered Stinson's investments in Talking Water and contacted Jürgen Denk to inquire as to the project's status.   In a handwritten letter dated July 6, 2010, Denk indicated that "all work for all entitlements" was complete, and that he expected the project to "pull permits and get started with construction" in August of 2010.   (Compl. Ex. G, July 6, 2010 letter from Jürgen Denk to SEC.) At that time, however, Talking Water, LLC still had to repay back taxes to retake clear title to the development tract.   (Talking Water tax summary.)   The Receiver wrote to Jürgen Denk to determine the project's status in May of 2011.   (Receiver's Mot. for TRO 7.)   Denk responded that the project was stalled due to a lack of funding.   (*See id*. Ex. G, May 20, 2011 letter from J. Peter Shindel to Jürgen Denk.)   When the Receiver attempted to follow up, he received no reply. (Receiver's Mot. for TRO 7.)   The Receiver then filed this lawsuit in June of 2011.

The Receiver's professional process server made six unsuccessful attempts to serve Defendants, but was initially unable to serve the Denks due to their efforts to avoid service.   (*See id*. at 7, 20.)   Meanwhile, the Denks began attempting to sell their primary residence, a commercial property in Iowa, and numerous properties controlled by them through shell companies.   (*Id*. at 8-9.)   They also transferred title to their properties in Iowa to a shell company, Lish LLC.   Lish obtained the properties via quitclaim deed, in exchange for no consideration. (*Id*. at 20; *see also* Mot. for TRO Ex. K, Transfer records for 714 Arden St., Boone IA.)   Lish's address is care of Lisa Denk.   (*Id*. Ex. J, Corporate information summary for Lish, LLC.)

In light of the Denks' apparent attempts to liquidate their assets, the Receiver moved for entry of an ex parte temporary restraining order.   The Court granted the Receiver's motion on July 27, 2011.   In granting the TRO, the Court ordered the parties to appear on August 8, 2011, to

show cause why a preliminary injunction should not issue.  No defendant attended the hearing.

However, counsel for Jürgen Denk communicated with the Receiver and asked that he advise the

Court of Jürgen Denk's discussions and cooperation with counsel for the Receiver.  (Aug. 7,

2011 letter from John Meininger to J. Peter Shindel 2.)  Denk's counsel has not entered an

appearance, and has indicated that he will not file an opposition to the Receiver's motion.


## II.      STANDARD OF REVIEW

In determining whether to grant a preliminary injunction, a court must consider whether

the party seeking the injunction has satisfied four factors:  (1) a likelihood of success on the

merits; (2) irreparable harm; (3) that the harm to the movant outweighs the possible harm to other

interested parties; and (4) that granting relief is in the public interest.  *Bimbo Bakeries USA, Inc.*

*v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010).  The moving party must produce evidence

"sufficient to convince the trial judge that all four factors favor preliminary relief."  *Singh v. Sch.*

*Dist. of Phila.*, Civ. A. No. 10-2028, 2010 WL 3220336, at *6 (E.D. Pa. Aug. 11, 2010) (quoting

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990)).


## III.     DISCUSSION

### A.      The Receiver's Reasonable Likelihood of Success on the Merits

The Receiver has documented the Denk Defendants' receipt of Stinson funds and offered

evidence calling into question the Denk Defendants' intention to develop the Talking Water

project, despite the Denk Defendants' representations to Stinson, the SEC and the Receiver.  The

Receiver has thus demonstrated that he is likely to prevail on his RICO claims.  The Receiver has

also demonstrated a likelihood of success on his unjust enrichment and fraudulent transfer claims, as he has offered evidence that the Stinson funds received no benefit in exchange for the $1,065,000 that Talking Water consumed.

        1.    *RICO claims*

The Receiver brings claims under 18 U.S.C. § 1962(d) against Defendants including Jürgen Denk, Lisa Denk, McNamara, and LJK.  Section 1962(d) makes it unlawful to conspire to violate a provision of the RICO statute.  Here, the underlying RICO violation the Receiver alleges is violation of § 1962(c) by operation of a racketeering enterprise.  To establish a § 1962(c) violation, the Receiver must show that Defendants conducted an enterprise affecting interstate commerce through a pattern of racketeering activity.  *See Salinas v. United States*, 522 U.S. 52, 62 (1997); *Whitney, Bradley & Brown, Inc. v. Kammermann*, App. No. 10-1880, 2011 WL 2489416, at *1 (4th Cir. June 23, 2011).

Any partnership, corporation, or legal entity may constitute a RICO enterprise.  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir. 2010).  A RICO plaintiff must show that the alleged enterprise: (1) is an ongoing organization that features some sort of framework for making and carrying out decisions; (2) that its component parts function as a continuing unit; and (3) that the enterprise is separate and appart from the pattern of activity in which it engages.  *See United States v. Urban*, 404 F.3d 754, 770 (3d Cir. 2005).  As a corporation legally distinct from its officers and employees — with Jürgen Denk at its helm — Talking Water, LLC qualifies as a RICO enterprise.  *See Jaguar Cars, Inc. v. Royal Oaks Motor Car, Inc.*, 46 F.3d 258, 268 (3d Cir. 1995).  The Receiver has also offered evidence that Talking Water, LLC operated in interstate commerce, as it solicited and obtained investments from the Stinson funds located in

6

Pennsylvania.

A "pattern" for the purposes of the RICO statute is a relationship between the predicate acts of racketeering and a threat of continuing activity. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). "Continuing activity" can constitute either a "closed period of repeated conduct" or "past conduct that by its nature projects into the future with a threat of repetition." *Id*. at 241. The statute requires plaintiffs to show that the defendants committed at least two acts of racketeering activity within a ten-year period to satisfy its "pattern" requirement. *See, e.g., CareOne, LLC v. Burris*, Civ. A. No. 10-2309, 2011 WL 2623503, at *8 (D.N.J. June 28, 2011) (citing 18 U.S.C. § 1961(1)(5)). These predicate acts may include mail or wire fraud under 18 U.S.C. §§ 1341 and 1343, respectively. *Id*.

The Receiver alleges Defendants engaged in wire fraud, mail fraud, and money laundering over roughly a four-year period. (*See* Mot. for TRO 12; Compl. ¶¶ 254-345.) The conduct is clearly a pattern for RICO purposes.

a.      *Mail and Wire Fraud*

To state a claim for mail fraud, the Receiver must allege: (1) the existence of a scheme to defraud; (2) the use of the mails in furtherance of the fraudulent scheme; and (3) participation by the defendant with the specific intent to defraud. *See CareOne*, 2011 WL 2623503, at *8 (quoting *United States v. Dobson*, 419 F.3d 231, 236-37 (3d Cir. 2005)). The elements of wire fraud are: (1) a scheme or artifice to defraud or obtain money or property; (2) by false or fraudulent pretenses; (3) via wire, radio, or television communication in interstate commerce. *See, e.g., Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295, 311 (D.N.J. 2005) (quoting 18 U.S.C. § 1343). The Receiver must satisfy Federal Rule of Civil Procedure 9(b)'s heightened

7

pleading standard to sustain these fraud-based claims.  *See CareOne*, 2011 WL 2623503, at *8 (citing *Warden v. McLelland*, 288 F.3d 105, 114 (3d Cir. 2002)).

The Receiver identifies numerous wire transfers from Stinson-controlled funds to Talking Water as instances of fraud.  Specifically, McNamara and Jürgen Denk induced the Stinson funds to send over a million dollars to the project by misrepresenting material facts about the project's status and the nature of the Stinson funds' investment.  For example, McNamara falsely represented to the Stinson funds that they would receive first lien positions on certain investments.  (*See* Receiver's Mot. for TRO 5.)

Meanwhile, Jürgen Denk was wiring funds from Talking Water to shell companies he controlled.  The Receiver alleges Denk provided nothing of value to the Talking Water project for these payments; Denk offers no argument in response.  The Receiver has also shown that Denk misrepresented the status of the project to the SEC and to the Receiver's counsel.  (*See* July 6, 2010 letter from Jürgen Denk to SEC.)  The Receiver is thus likely to succeed in establishing that the Denk Defendants engaged in mail and wire fraud.

### b.    *Money laundering*

To state a claim for money laundering, the Receiver must show that a defendant: (1) knowingly conducted a financial transaction; (2) which involved the proceeds of an unlawful activity; (3) with the intent to promote or further the unlawful activity.  18 U.S.C. § 1956(a)(1)(A)(i);  *see also United States v. Dovalina*, 262 F.3d 472, 475 (5th Cir. 2001).  The Receiver's money laundering claims are based on the flow of funds from Stinson entities to Talking Water, LLC, and then from Talking Water via various shell companies to the Denks themselves.  These payments were both the fruits of the Denk Defendants' alleged RICO

enterprise and in furtherance of the Talking Water RICO scheme.  The Receiver has thus shown that he is likely to demonstrate that the Denk Defendants engaged in money laundering.  This showing, coupled with the evidence of mail and wire fraud discussed above, is sufficient to satisfy the RICO statute's "pattern of racketeering activity" requirement and demonstrates that the Receiver is likely to prevail on his RICO claims.

### 3. *Unjust enrichment*

The Receiver brings unjust enrichment claims against all Defendants.  Pennsylvania law requires the Receiver to allege the following three elements to state an unjust enrichment claim: (1) that it conferred benefits upon defendants; (2) that defendants realized those benefits; and (3) that defendants retained those benefits under circumstances in which it would be inequitable to do so.  *See State Farm Mut. Auto. Ins. Co. v. Ficchi*, Civ. A. No. 10-555, 2011 WL 2313203, at *14 (E.D. Pa. June 13, 2011).  As discussed above, the Receiver has traced funds directly from the Stinson entities to the Denk Defendants' pockets.  Given the Receiver's showing that the Denk Defendants obtained these payments while the Talking Water project slipped into debt and tax delinquency — and the Denk Defendants' failure to present any evidence to the contrary — the Receiver has shown that he is likely to prevail on his unjust enrichment claim at trial.

### 4. *Fraudulent transfer*

The Receiver brings fraudulent transfer claims under the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"), 12 Pa. Cons. Stat. § 5101.  PUFTA permits the Receiver to recover profit and principal "from winning investors in certain circumstances."  *SEC v. Forte*, Civ. A. No. 09-63, 2010 WL 939042, at *5 (E.D. Pa. Mar. 17, 2010).  The existence of a Ponzi scheme is sufficient to establish intent to defraud.  *Id.* (quoting *Donnell v. Kowell*, 533 F.3d 762,

770 (9th Cir. 2008)).   In a prior opinion, the Court found that Stinson operated his investment funds as a Ponzi scheme.  *Stinson*, 2011 WL 2462038.  The Receiver may thus recover the entire amount paid to the winning investor unless the investor can establish both his innocence and an exchange of fair value.  *Forte*, 2010 WL 939042, at *5 (citing 12 Pa. Cons. Stat. § 5108(d)).  The Denk Defendants offer no such evidence.  Indeed, the Receiver has demonstrated that Talking Water, LLC paid nearly one million dollars for the Denk Defendants' services in managing a project which never began construction and whose real estate was sold at a tax sale.  Talking Water itself obtained these funds from the Stinson Ponzi scheme.  The Receiver is thus likely to prevail on his fraudulent transfer claims.

### B.      Irreparable harm

The Receiver identifies its inability to fund a judgment against the Denk Defendants as irreparable harm sufficient to warrant injunctive relief.  Loss of a future damages remedy may constitute irreparable harm.  *Elliott v. Kieswetter*, 98 F.3d 47, 57 (3d Cir. 1996).  District courts enjoy the power "to protect a potential future damages remedy with a preliminary injunction [where] . . . . plaintiffs are likely to become entitled to the encumbered funds upon final judgment and [they make] a showing that without the preliminary injunction, plaintiffs will probably be unable to recover those funds."  *Id*.  The Receiver has made such a showing in this case; the sale or transfer of the Denk Defendants' assets will irreparably impair the Receiver's ability to realize the judgment it will likely obtain.

Though the Receiver ultimately succeeded in serving the Denk Defendants, their earlier attempts to avoid service "shrouds their trustworthiness with suspicion, and enhances the risk that [they] may endeavor to dissipate their assets, if not enjoined."  *Fed. Trade Comm'n v.*

*Windermere Big Win Int'l, Inc.*, Civ. A. No. 98-8066, 1999 WL 608715, at *3 (N.D. Ill. Aug. 5, 1999).  This conduct also demonstrates the concrete potential of irreparable harm through the dissipation of the Denk Defendants' assets.

      **C.**    **Balance of harms**

      The Receiver's proposed relief would obligate the Denk Defendants to place funds from sales of their assets into escrow and provide an accounting of their real estate transactions.  It would also enjoin them from engaging in further sales or transfers without Court approval.  The likely loss of millions in restitution to defrauded investors outweighs whatever inconvenience this may cause the Denk Defendants.  The Receiver has carried his burden to show that the balance of harms in this case favors the injunctive relief he requests.

      **D.**    **Public interest**

      Public policy favors injunctions to protect "likely judgments."  *Francis v. Pulley*, Civ. A. No. 06-480, 2006 WL 3827514, at *2 (D.N.H. Dec. 28, 2006).  This factor thus weighs in the Receiver's favor.  Furthermore, the Receiver is likely to prevail on his RICO claims and may therefore recover treble damages pursuant to 18 U.S.C. § 1964(c).  As this recovery represents a significant portion of the potential restitution that may be realized to compensate victims of the Stinson Ponzi scheme, public policy dictates that the Receiver's likely judgment in this case should be preserved.

      **E.**    **Bond Requirement**

      Federal Rule of Civil Procedure 65(c) requires the movant to give security "in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The Third Circuit interprets Rule 65's bond

requirement strictly. *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 210 (3d Cir. 1990). As other courts have observed, the appointment of a receiver minimizes any risk of harm to the enjoined parties. *See Little Earth of United Tribes, Inc. v. U.S. Dep't of Housing and Urban Dev.*, 584 F. Supp. 1301, 1303-04 (D. Minn. 1983). Nevertheless, the Third Circuit has "never excused a District Court from requiring a bond where an injunction prevents commercial, money-making activities." *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010). The Court concludes that a bond of $50,000 is reasonable under the circumstances.

## IV.    CONCLUSION

The Receiver has carried his burden to obtain a preliminary injunction. Pursuant to Federal Rule of Civil Procedure 65(c), the Court will impose a security bond of $50,000. An Order consistent with this Memorandum will be docketed separately.